8ᴬO 91 (REV.5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

BENEVOLENCE INTERNATIONAL FOUNDATION, INC., and ENAAM M. ARNAOUT, a/k/a "Abu Mahmoud", a/k/a "Abdel Samia"

**FILED**
SEP 13 2002
SEP 13 2002
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
SEP 18 2002

**CRIMINAL COMPLAINT**

MAGISTRATE JUDGE LEVIN

CASE NUMBER:

**02CR0892**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about <u>March 26, 2002 and April 5, 2002</u> in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u>, <u>Eastern Division</u>, defendants did:

in a matter within the jurisdiction of the judicial branch of Government of the United States, knowingly and willfully make materially false, fictitious and fraudulent statements and representations, and made and used false writings and documents knowing the same to contain materially false, fictitious and fraudulent statements; and in declarations and statements under penalty of perjury as permitted under 28 U.S.C. § 1746 willfully subscribe as true material matters which they did not believe to be true

in violation of Title __18__ United States Code, Sections <u>1001(a)(2) and (3);</u> and <u>1621(2)</u>.

I further state that I am a(n) <u>Special Agent, Federal Bureau of Investigation</u> and that this complaint is based on the following facts:

　　　　See attached affidavit.

Continued on the attached sheet and made a part hereof: __XX__ Yes ___ No

_____, SA, FBI
Thomas J. Simon, Jr., Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

<u>September 13, 2002</u>
Date

at

<u>Chicago, Illinois</u>
City and State

<u>IAN H. LEVIN, U.S. Magistrate Judge</u>
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF ILLINOIS     )
                      )  SS
COUNTY OF COOK        )

## AFFIDAVIT IN SUPPORT OF COMPLAINT
## AGAINST BENEVOLENCE INTERNATIONAL FOUNDATION, INC. AND
## ENAAM M. ARNAOUT, a/k/a "Abu Mahmood", a/k/a "Abdel Samia"

I, Thomas J. Simon, Jr., being duly sworn, depose and state:

1. I am a special agent with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, assigned to the Chicago Field Division. I have been employed by the FBI as a special agent for more than 7 years, and I am assigned to the Chicago Joint Terrorist Task Force.

2. This affidavit contains information necessary to support a criminal complaint against ENAAM M. ARNAOUT, date of birth June 24, 1962. It is not intended to include each and every fact and matter known by the government. The information provided below is based on information collected by the FBI, information conveyed to me by other law enforcement officials, and information compiled from other sources.

3. Based upon the facts set forth below, I submit that there is reason to believe that defendants BENEVOLENCE INTERNATIONAL FOUNDATION, INC. ("BIF") and ENAAM M. ARNAOUT, have committed violations of Title 18, United States Code, Sections 1001(a) (statements or entries generally) and 1621(2) (perjury generally).

Overview of Charges

4. As set forth in more detail below, there is probable cause to believe that defendants ENAAM ARNAOUT and BENEVOLENCE

INTERNATIONAL FOUNDATION, INC. knowingly and willfully made and submitted false material declarations under oath, and under penalties of perjury, in a civil proceeding pending in the United States District Court for the Northern District of Illinois, Eastern Division, before the Honorable James H. Alesia: *Benevolence International Foundation, Inc. v. John Ashcroft, Attorney General, et. al,* No. 02 C 763 (N.D. Ill.). In that proceeding, BIF seeks, among other things, the return of BIF's seized or blocked property and to void a blocking order which froze the accounts of BIF. In particular, in Declarations filed on March 26 and April 5, 2002 in that proceeding, defendants ENAAM ARNAOUT and BENEVOLENCE INTERNATIONAL FOUNDATION (acting through its director ARNAOUT) falsely stated under oath that:

> BIF is required to maintain the donations of *zakat* in a non-interest bearing account and to use those funds only to assist the poor and needy. BIF abides strictly by those requirements.
>
> . . .
>
> <u>BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature</u>. BIF abhors terrorism and all forms of violence against human beings.
>
> . . .
>
> I have no idea or understanding as to why the government has taken these actions [blocking of assets] against BIF.

(Emphasis added)

In truth, as shown particularly in paragraphs [a-d] below, BIF was in fact engaged in the support of various persons and groups

2

involved in military and terrorist type activity.

In particular, the evidence set forth below demonstrates:

a. - ARNAOUT has a relationship with Usama Bin Laden and many of his key associates dating back more than a decade, as evidenced by cooperating witnesses and seized documents;

b. - BIF is an organization that al Qaeda has used for logistical support, including the movement of money to fund its operations, according to a cooperating witness familiar with al Qaeda;

c. - various persons involved in terrorist activities - specifically including persons trying to obtain chemical and nuclear weapons on behalf of al Qaeda - have had contacts with BIF offices and personnel;

d. - BIF has had direct dealings with representatives of the Chechen *mujahideen* (guerillas or freedom fighters) as well as Hezb e Islami, a military group operating at various times in Afghanistan and Azerbaijan. BIF made efforts to provide the Chechen *mujahideen* with money, an X-ray machine, and anti-mine boots, among other things.

5. This affidavit is divided into four parts. In Part I, the background of ARNAOUT and BIF is described. In Part II, ties between certain terrorists and BIF and ARNAOUT are set forth. Part III sets forth the dealings between ARNAOUT, BIF and the Chechen

3

*mujahideen*. Part IV describes BIF's and ARNAOUT's efforts to frustrate international investigations and obstruct justice.

Part I: Background of Benevolence International Foundation and ARNAOUT

6. The Benevolence International Foundation ("BIF"), headquartered in Palos Hills, Illinois, purports to be an international charity organization involved in fundraising for charitable causes and is believed to do some significant charity work. BIF has offices in Pakistan, Bosnia, Azerbaijan, Tajikistan, Yemen, Bangladesh, Turkey, Dagestan, Georgia, China and Ingueshetia. BIF had an office in Chechnya, but moved the office to Ingueshetia after an armed conflict within Chechnya began.

7. The organization known as "AL BIR AL DAWALIA," which translated from Arabic means "BENEVOLENCE INTERNATIONAL," was originally founded in the 1980's by a wealthy Saudi Arabian national named Sheik Adil Abdul Galil Batargy, who was involved with the *mujahideen* in Afghanistan and was an associate of Bin Laden, as confirmed by a cooperating witness and some documents recently seized in Bosnia (see paragraph 17). Batargy later transferred control of the organization to the current Chief Executive Officer ENAAM M. ARNAOUT.

8. BIF was incorporated in the State of Illinois as a non-profit organization on or around March 30, 1992. One of the directors listed on the incorporation documents is Adel Abdul Jalil

4

Batterjee. (Affiant believes Adel Abdul Jalil Batterjee is the same person as Adil Abdul Galil Batargy.) Documents filed with the State of Illinois show that on September 15, 1997, the Executive Director of BIF was ENAAM ARNAOUT. ARNAOUT has been affiliated with BIF since at least 1992.

Al Qaeda's Practice of Using Charities for Terrorist Purposes

9. Evidence introduced at trial in *United States v. Usama Bin Laden, et al.*, Case Number S98 Cr. 1023, United States District Court, Southern District of New York, and evidence gathered in the related investigation, demonstrated that al Qaeda sought and received a substantial amount of financial support from numerous international sources for the procurement of equipment (including weapons and communication equipment), recruitment, training, transportation, and lodging, among other expenses. In addition, investigations have revealed that members and associates of al Qaeda receive training in how to avoid law enforcement and intelligence scrutiny and have a proven ability to travel surreptitiously.

10. A reliable cooperative witness ("CW1"), who is a former member of al Qaeda who had repeated contact with Usama Bin Laden for a number of years in the late 1980's and early 1990's, and is in a position to testify,[1] advised being familiar with AL BIR AL

---

[1] CW1 has entered into a cooperation agreement with the United States Government and pleaded guilty to a criminal conspiracy
(continued...)

DAWALIA (i.e. BIF) and having knowledge of Batargy being a high ranking official within BIF.[2] CW1 stated that several al Qaeda members held positions in BIF and that this organization was one of the organizations utilized by al Qaeda. Specifically, according to CW1, BIF was used in the early 1990's by Usama Bin Laden as a means to transfer money to bank accounts, generally held by purported relief organizations, in countries where al Qaeda members or associates were conducting operations.

11. CW1 reported that as a general matter, once money was withdrawn from the bank accounts of relief organizations, its use by al Qaeda would be virtually untraceable. CW1 explained that the money would almost always be withdrawn in cash, and the relief organizations from whose account the money was taken would generate paperwork which indicated that all the money was being used for charitable purposes such as building mosques or schools, or providing food and clothing for the poor. According to CW1, only a portion of the money withdrawn was actually used for the purposes stated by the relief organizations. The remaining funds were

---

[1](...continued) charge arising out of his participation in al Qaeda related terrorist activities.

[2] Although CW1 knew BIF by its Arabic name, the organization will be discussed hereafter as "BIF" (the acronym for the English translation of the name) for ease of understanding.

provided to al Qaeda for whatever use al Qaeda deemed necessary.[3]

ARNAOUT's Ties to Usama Bin Laden

12. A reliable cooperative witness ("CW2"), who is in a position to testify, advised being familiar with ARNAOUT and his activities while ARNAOUT lived in Pakistan in 1989.[4] CW2 reported that on one occasion in 1989, ARNAOUT traveled to the airport in Islamabad, Pakistan, picked up one of the wives of Usama Bin Laden, and took her to ARNAOUT's residence. Approximately a week later, Usama Bin Laden and his bodyguards arrived during the night and picked up Bin Laden's wife. CW2 explained that if ARNAOUT had not been a trusted associate of Usama Bin Laden, ARNAOUT would not have

---

[3] This is consistent with evidence adduced at the 1995 trial in the Southern District of New York of persons convicted of seditious conspiracy involving the 1993 plot to attack various buildings in New York. One of the defendants (Clement Hampton-el) admitted on the witness stand that he had been smuggling money into the United States for military training from the Third World Relief Agency in Vienna, Austria, which was involved in Bosnian relief efforts.

Similarly, Wadih el Hage, convicted in 2001 in the Southern District of New York for his participation with Usama Bin Laden and others in a conspiracy to kill United States nationals overseas (which conspiracy included the bombing of the United States embassies in Kenya as overt acts), and Fazul Abdullah Mohamed, a/k/a "Harun," the fugitive al Qaeda member charged with executing the embassy bombings, both operated a charity known as "Help Africa People" in Kenya in the years preceding the embassy bombings. Moreover, certain incriminating files belonging to el Hage were secreted at the offices of a non-government organization known as the Mercy International Relief Agency (headquartered in Dublin, Ireland, which is separate and distinct from the Mercy International Relief Agency in the United States).

[4] Investigation has corroborated that CW2 was in Pakistan during the relevant time frame and that CW2 was familiar with ARNAOUT.

7

been trusted with the care of one of Bin Laden's wives.

13. CW2 also identified ARNAOUT as being a close associate of Gulbuddin Hekmatyar and being involved with Hekmatyar's organization Hezb-e-Islami in 1989.[5] Hekmatyar and the Hezb-e-Islami have connections with several convicted terrorists, including Sheik Omar Abdel Rahman, convicted in United States District Court for the Southern District of New York of offenses related to a seditious conspiracy which involved the bombing of the World Trade Center in 1993 as an overt act. (The Government is in possession of a videotape showing ARNAOUT in the company of Hekmatyar assembling a satellite telephone and speaking on it.)

14. CW2 advised that ARNAOUT lived in an apartment building in Pakistan in 1989 that housed several families and *mujahideen*.

---

[5] A cooperative witness ("CW3") is in a position to testify. CW3 has been involved in extensive terrorist activity and has provided false information to investigators in the past. CW3 has pleaded guilty to terrorism charges and entered into a cooperation agreement with the Government and has provided information to the Government which has been corroborated. CW3 advised being familiar with Hekmatyar. CW3 advised meeting with Hekmatyar in 1989 in New York. CW3 said that Hekmatyar was based out of Jalalabad, Afghanistan, and that Hekmatyar provided land in the territory that Hekmatyar controlled for the training camps of Usama Bin Laden and al Qaeda. According to CW3, Usama Bin Laden paid Hekmatyar for the right to use Hekmatyar's land.

Another confidential source of information ("CS")(described in paragraph 17) described Gulbuddin Hekmatyar as one of the leaders of the *mujahideen* in Afghanistan who was known as "the Engineer." According to CS, Hekmatyar in essence founded Hezb-e-Islami in Afghanistan and eventually Hezb-e-Islami leased land to al Qaeda for training camps. Eventually, in or about 1993, Hezb-e-Islami began sending fighters to Baku, Azerbaijan, to fight against Armenian forces in a military conflict.

Outside the apartment were walls with guard towers on each side. In ARNAOUT's apartment, ARNAOUT kept thousands of dollars of cash in shoe boxes. The cash was in the currency of several different countries, including the United States.

15. CW2 also explained that in 1989, ARNAOUT was involved with directing convoys of trucks carrying weapons and ammunition into Afghanistan.

by a confidante of ARNAOUT that this information was not true.

16. A confidential source ("CS") identified a photograph of ARNAOUT as "Abdel Samia," also known as "Abu Mahmoud," known aliases of ARNAOUT. CS was involved in extensive terrorist activity, has been convicted of serious terrorism crimes and has provided false information concerning terrorism matters in prior years, although CS has also provided information which has been corroborated. CS was interviewed in the hope of CS working out a cooperation agreement with the Government that would afford him sentencing considerations. CS's statements regarding ARNAOUT have been corroborated by documents recovered in recent searches in Bosnia and the fact that CS described ARNAOUT's alias "Abdel Samia" before he was shown any of the documents reflecting that name. CS stated that ARNAOUT was close to Usama Bin Laden in Afghanistan in the 1980's when Bin Laden and others were based in the "al Masada"

9

area.[6] ARNAOUT was an administrator for Usama Bin Laden who disbursed funds at times on behalf of Bin Laden.

17. On or about March 19, 2002, law enforcement authorities in Bosnia-Herzegovina searched eight locations affiliated with BIF, including BIF's offices in that country. Authorities recovered three firearms, ski masks, numerous military manuals on topics including small arms and explosives, a fraudulent passport, and BIF correspondence among other items. Also recovered were a number of classified documents belonging to multiple governments concerning Islamic extremism. In addition, photographs were recovered which included photographs of Usama Bin Laden in Afghanistan (likely dating to the 1980's) as well as ARNAOUT handling rifles, a shoulder-fired rocket and an anti-aircraft gun.

18. The documents recovered also included documents establishing direct communication between ARNAOUT and Usama Bin Laden and others in the late 1980's and early 1990's. The documents included a disk found at BIF's office in Bosnia which included scanned images of these historical documents. For example, some of the documents recovered included: an administrative chart showing that "Abu Abdallah" (the well-known alias of Usama Bin Laden) was the "emir", Abu Ubaidah (the late military commander of al Qaeda who drowned in a ferry accident in

---

[6] For ease of reference, ARNAOUT will be referred to in true name even though he was known to CS by his war names.

10

Africa in 1996) was in charge of military matters[7]; "Abu Hajer" (the well-known alias of Mamdouh Salim discussed in paragraphs 21-25) was in charge of "wireless communications" for the military branch and "hospitality" for the money and management aspect of the organization; "Abu Rida" (the alias of Mohamed Bayzid, discussed in paragraph 26) was in charge of purchases and other entries, some of which were illegible. Another chart reflected ARNAOUT ("Abu Mahmoud") at the top of "My Organization (Jihady)" with a substructure for "The Mujahideen Program" with further subcategories with references to "weapons" and "mujahideen." Other documents included charts of codes to be used on the radio in communicating messages, which could be used, for example, to pass messages to ship weapons from one location to another. While the documents appear to date to the time period in the late 1980's, they clearly demonstrated the relationship of trust between ARNAOUT and the leaders of the jihad network in Afghanistan.

19. Still other documents included documents signed by ARNAOUT as well as Usama Bin Laden, including writings from Usama Bin Laden to ARNAOUT and from ARNAOUT to Usama Bin Laden.[8] Other

---

[7] There was abundant evidence at the *Bin Laden* trial in New York of Abu Ubaidah's status as al Qaeda's military commander, including the testimony of two former members of al Qaeda as well as documentary evidence.

[8] ARNAOUT apparently discussed his relationship (or purported lack thereof) with Bin Laden as reported in an article appearing in the *Chicago Tribune* on March 10, 2002, indicating that ARNAOUT
(continued...)

documents indicate that Usama Bin Laden had traveled to a location (described in code) and that ARNAOUT was with him. Also recovered was a letter to ARNAOUT from Osama Azmarai (Wali Khan discussed in paragraphs 21 d, 28-33) seeking money to be transferred by ARNAOUT to an Afghani commander with notes on the reverse headed "weapons." Other documents dating from a later period in 1991 and 1992 indicate requests from a person who wanted aid sent to *mujahideen* and a weapon provided to an associate. Additional documents corroborate the coordination between certain ostensible charities and the al Qaeda network as described by CW1. One document showed expenditure for the "administration of jihad" paid by the "Islamic Charity Committee" as well as a 1988 document showing that "Abu Hajer" (Mamdouh Salim, described in paragraphs 20, 22) and Dr. Fadl (a leading figure in the Egyptian al Jihad group – now a designated foreign terrorist organization[9]) mediating a dispute among different Islamic charity organizations.

---

[8] (...continued)
claimed that he saw Bin Laden in Afghanistan but did not know him personally.

[9] CW1 described Dr. Fadl as a leading figure in the Egyptian Islamic Jihad ("EIJ") group and a member at some time of al Qaeda's *shura* council (which provided consultation and advice to Usama Bin Laden). CW3 described Dr. Fadl as a leader of EIJ and a close associate of Ayman al Zawahiri, an indicted fugitive in *United States v. Usama Bin Laden et al.*, who is charged with the embassy bombings and who has appeared in recent videotaped broadcasts alongside Usama Bin Laden. CW3 indicated that Dr. Fadl issued *fatwahs* (Islamic legal rulings). CS also indicated that Dr. Fadl issued *fatwahs* and indicated that Dr. Fadl, while less well known, was of the same stature as Ayman Zawahiri.

<u>Part II: BIF Ties to Persons Involved in Terrorist Activity</u>

20.     As described in the following paragraphs, various persons involved in terrorist activity, particularly with the al Qaeda network, were in contact with ARNAOUT or the BIF office in Palos Hills, Illinois, at various times. Those persons include:

a.     <u>Mamdouh Salim</u> (a key Bin Laden associate who authored *fatwahs,* or Islamic legal rulings, justifying attacks by al Qaeda against civilians and participated in efforts to obtain nuclear and chemical weapons for al Qaeda and who attempted to murder a corrections officer in the federal jail in New York while awaiting trial for his participation to kill American nationals; several months prior to his arrest in Germany, Salim traveled to Bosnia where his visa and housing was sponsored by BIF and where a statement was signed on behalf of BIF and ARNAOUT attesting that Salim was a "director" of BIF;

b.     <u>Mohamed Bayazid</u> (who made efforts to get uranium for al Qaeda to develop a nuclear weapon; Bayazid obtained a driver's license reflecting his residence as the address of BIF's Illinois office);

c.     <u>Mohamad Jamal Khalifa</u> (Usama Bin Laden's brother-in-law who has been closely linked to terrorist operatives

13

who carried out the 1993 World Trade Center bombing and sought in the Philippines to bomb 12 airliners over American cities in 1994 as well as to assassinate the Pope; Khalifa was traveling with Bayazid at that time and a telephone number associated with Khalifa was contacted by the BIF Illinois office as recently as November 1998) (see paragraph 24 below); and

d.    <u>Wali Khan Amin Shah</u> (key participant in the plot in the Philippines to bomb 12 airliners over American cities in 1994 as well as to assassinate the Pope; Khan wrote a request to ARNAOUT to provide money to an Afghan field commander for weapons in the late 1980's).

<u>The BIF Link to Mamdouh Salim</u>:

21.    As established by evidence introduced at the *United States v. Bin Laden* trial in New York in 2001, Mamdouh Salim, a/k/a "Abu Hajer," was a very close associate of Bin Laden who pronounced *fatwahs* which authorized the killing of innocent civilians.[10] Salim is also the person who approved the purchase of uranium by Bayazid

---

[10] Salim reasoned that if an attack on an American building killed Americans, that was beneficial. If Muslims working with the Americans were killed, these Muslims were being punished for helping the American infidels. If innocent Muslim bystanders were killed, they would become martyrs and go to paradise and would thus be grateful to those who carried out the bombing.

14

(described in paragraph 26) for the purpose of developing a nuclear weapon. Salim was also implicated by testimony at the 2001 trial of *United States v. Bin Laden, et al.,* in New York in efforts to develop chemical weapons in the Sudan on behalf of al Qaeda.

22. In May 1998, Salim visited Bosnia and Herzegovina. Salim was arrested in Germany in September 1998 and extradited to the United States in December 1998. He is currently awaiting trial in the Southern District of New York on charges of conspiring with Usama Bin Laden and other members and associates of al Qaeda to kill United States nationals.[11]

23. While in Bosnia, Salim stayed at a hotel where Salim was described to the owner of the hotel as a director of BIF in a writing signed in the name of ARNAOUT. His rented apartment was reserved by the Ljiljen Commerce Group, an entity owned by BIF and of which ARNAOUT is a director. ARNAOUT and BIF also arranged for Salim's visa to Bosnia.

---

[11] Salim was to be part of the 2001 trial but was severed from that trial after he took a corrections officer hostage at the Metropolitan Correctional Center in New York and stabbed him repeatedly with an improvised knife, severely wounding him. Salim also sought at that time to take defense attorneys hostage to demand his release and the release of the embassy bombers and Sheik Omar Abdel Rahman. On April 3, 2002, Salim pleaded guilty to attempted murder of the correction officer.

Following Salim's arrest and incarceration, Usama Bin Laden issued a videotaped statement in or about September 2000 in which he threatened American interests while wearing a Yemeni dagger. Approximately one month later, the U.S.S. Cole was bombed while in port in Yemen. In that video, Bin Laden praised Wali Khan (discussed in paragraphs 21 d, 28-33) by his alias "Azmarai."

15

24.   The long-standing relationship between Bayazid, Salim, Bin Laden and ARNAOUT is demonstrated by some of the documents seized in the March 2002 search in Bosnia, described in paragraphs 18-20.

The BIF Link to Mohamed Bayazid

25.   Mohamed Loay Bayazid, a/k/a "Abu Rida al Suri," has been implicated in testimony at the *Bin Laden* trial in the Southern District of New York in efforts in the Sudan in or about 1993-1994 to obtain uranium for Usama Bin Laden for the purpose of developing a nuclear weapon.   On December 16, 1994, Bayazid was stopped in San Francisco in the presence of Mohamad Jamal Khalifah, the brother-in-law of Usama Bin Laden.   At the time, Bayazid was found to be in possession of an Illinois driver's license indicating that his residence was the BIF office in Illinois.   As recently as November 1998, toll records for BIF's office in Illinois reflected telephonic contact with a telephone number in Turkey associated with Bayazid.[12]

The BIF Link to Mohamad Jamal Khalifa

26.   On December 16, 1994, Mohamad Jamal Khalifa, while

_____

[12] American Express billing records indicate that Bayazid moved from the United States to Turkey in or about April 1998.  Following Bayazid's move to Turkey, telephone records of Bayazid's relatives in the United States reflect a number of calls to the number in Turkey contacted by BIF in November 1998.  Moreover, telephone records for "Maram" in Turkey, which Mamdouh Salim admits he sold to Bayazid, reflect calls to BIF in Illinois in August and September 1998.

traveling with the aforementioned Bayazid, was detained in San Francisco by American officials. At the time, Khalifa had been living for a substantial period of time in Manila, the Philippines, and was affiliated with a number of entities, including a non-government organization known as Benevolence International Corporation ("BIC") and the International Islamic Relief Organization ("IIRO"). At the time of his travel, Khalifa had been convicted *in absentia* in Jordan for his alleged involvement in 1993 and 1994 in a series of bombings of public places in Jordan, including movie theaters.[13] Two of the principal participants in the bombing were Jordanians who had spent time with Khalifa in the Philippines but who had then returned to Jordan to conduct these bombings and contemplated assassinations. Khalifah was then retried -- and acquitted -- after his extradition from San

---

[13] Khalifa has been linked to Omar Abdel Rahman. In or about August 1993, a search was conducted of the New Jersey residence of Omar Abdel Rahman, the Egyptian cleric who was the spiritual leader of the designated terrorist group al Gamaa al Islamia ("the Islamic Group"), and who would be convicted in October 1995 of participating in a seditious conspiracy to levy war against the United States, which conspiracy included a Spring 1993 plot to bomb the Holland and Lincoln tunnels, the FBI building in New York and the United Nations building and also included as an overt act the 1993 bombing of the World Trade Center. Abdel Rahman was also convicted of soliciting crimes of violence and conspiracy to assassinate President Hosni Mubarak of Egypt. Among Abdel Rahman's possessions was a business card for Mohamed Jamal Khalifa, along with a series of important papers in Abdel Rahman's suitcase, which also contained $62,000 in cash.

Khalifa's alias "Abu Baraa" was also found written on a manual seized from Ahmad Ajaj, convicted of the 1993 World Trade Center bombing.

Francisco to Jordan following the December 1994 stop. At his Jordanian trial, Khalifa admitted to the Jordanian authorities that he had known the bombers and had sent them money but claimed that it was for past services. In his San Francisco interview, Khalifa admitted knowing and training the bombers but claimed that he disassociated himself from the bombers upon learning that they were violent.

27. Meanwhile, items in Khalifa's possession were copied by American authorities and would turn out after subsequent investigation to tie Khalifa closely to the activities of several terrorists then engaged in terrorist activity in the Philippines: Ramzi Yousef (then a fugitive from the 1993 World Trade Center bombing) and Wali Khan Amin Shah. At the 1996 trial of *United States v. Ramzi Yousef, et al.*, in the Southern District of New York in 1996, Yousef and Wali Khan Amin Shah were both convicted of participating in a plot to bomb 12 American flag airliners simultaneously. The plot was to involve 12 flights originating from Southeast Asia, destined for large American cities, which were to be exploded over the Pacific Ocean.[14] In November 1994, there

---

[14] Evidence at the 1996 trial in the Southern District of New York of *United States v. Ramzi Yousef, et al.*, established that on December 1, 1994, Yousef detonated a pipebomb beneath the seats of the Greenbelt theater in Manila. The evidence further established that on December 11, 1994, Yousef detonated a bomb aboard a Philippines Airline jet en route from the Philippines to Japan, killing one passenger, in what was an apparent test run for a plan to blow up a dozen American registered airliners.

(continued...)

18

was a pattern of telephone traffic between Khan's apartment and the cellular telephone of Khalifa, while Yousef was proceeding at about that time with the purchase of chemicals.

28. At the time Khalifa was detained at the San Francisco airport on December 16, 1994, he had Wali Khan's beeper number in his phonebook as well as in his electronic organizer. Khalifa also had: (i) an entry for a number in Pakistan which Yousef had called from Manila; (ii) an entry for the cellular telephone of an associate of Wali Khan and Yousef (which Yousef also had in his phonebook), and (iii) an entry for Usama Bin Laden. Khalifa also possessed documents referring to the assassination of bishops and bombings of churches (at a time when evidence gathered in the investigation indicates that Wali Khan and others were planning to kill the Pope during a planned January 1995 visit to the Philippines and after churches had already been bombed in the Philippines in the preceding year).

29. In early January 1995, Murad Hakim, a fourth conspirator of Yousef, Khalid Shaik Mohamed and Wali Khan, was arrested in Manila as a result of a fire in the apartment where Hakim and Yousef had been mixing bombs. Seized in the apartment were: pictures of the Pope, two cassocks and priests' garb, pipebombs,

---

[14](...continued)
Khalid Shaikh Mohamad is an indicted fugitive in *United States v. Ramzi Yousef, et al.* Yousef was also convicted at a separate trial of the 1993 bombing of the World Trade Center.

chemicals, Casio watches modified to act as timers and Yousef's computer which contained the encrypted numbers of Khalifa and Khalifa's "charitable" organization as well as the plan to blow up 12 airliners and Wali Khan's photograph.

30. Wali Khan was arrested several days later. Khan's phonebook and cellular phone bills contained five telephone numbers of Khalifa as well as Khalifa's business card, together with diary entries making it clear that Khan was providing weapons to a faction in Kashmir at the time. Wali Khan escaped in short order but was later arrested in Southeast Asia, brought to the United States, and convicted at the 1996 New York trial. (As set forth below, Wali Khan is independently linked to ARNAOUT and indeed ARNAOUT provided an Afghan field commander with money for weapons in the late 1980's at the request of Khan.)

31. In February 1995, Ramzi Yousef was arrested in Pakistan; his phonebook had a listing for "Khalifa." Yousef admitted his role in the World Trade Center bombing, the Philippines Airlines bombing, and the plot to bomb multiple airliners. Yousef indicated that Wali Khan had provided him with the business card of Khalifa in case he needed help; moreover, he admitted that he was familiar with the name of Bin Laden, and knew him to be a relative of Khalifa, but declined to elaborate.

32. In addition, Yousef had a listing for "Khalifah" in both his encrypted computer file and in his telephone/address book. The

20

encrypted log also contained a Post Office box for Mohammad Khalifah in Lebanon. Yousef's encrypted phone book listed the telephone number of Khalifa's charity. Thus, Khalifah is linked directly to Ramzi Yousef, the key figure in the World Trade Center bombing and the plot to bomb U.S. airliners, as well as Wali Khan, involved in the airplane plot and the effort to kill the Pope.

33. BIF's link to Khalifah is not limited to the fact that Khalifah was traveling in California with companion Bayazid, who had the license indicating BIF's Illinois office was his address. In addition, Khalifa' alias "Abu Baraa" is referenced on a historical document recovered in the searches of BIF locations in Bosnia in March 2002 described in paragraph 18. Moreover, on or about November 19, 1998, telephone toll records indicate that BIF's Illinois office was in telephonic contact with a telephone number in Saudi Arabia used by Khalifa.

The ARNAOUT Link to Wali Khan

34. ARNAOUT is also linked to Khalifa's associate Wali Khan. The documents seized in Bosnia in March 2002 described in paragraph 18 include a letter written by Wali Khan (in his alias "Osama Azmarai") to ARNAOUT seeking to have money transferred to a commander and the reverse of the letter bears writing indicating that the money was transferred and involved weapons.

Part III: The 1995 BIF Dealings with the Chechen Mujahideen

35. Materials recovered as a result of the December 14, 2001,

21

search of BIF's office in Palos Hills, Illinois and the blocking action documented some of the contact between BIF and the Chechen *mujahideen*. In particular, documents indicate that in June 1995 an X-ray machine was delivered by a BIF representative to a named representative of the Chechen *mujahideen* in Baku, Azerbaijan (the "Chechen Representative"), who acknowledged in writing that "As arranged this unit will be transported to Chechnya for the use of the Chechen *mujahideen*." That statement was witnessed by the BIF representatives from Karachi, Pakistan, and from Baku, Azerbaijan. Other documents recovered in BIF's offices in Illinois reflect reporting by the BIF Karachi representative that he had traveled to Azerbaijan "to carry and safely deliver a mobile x-ray unit to the representative of the Chechen freedom fighters in Baku. The secondary objective was to meet the people, based in Baku, who are responsible for coordinating the relief efforts to the Chechen mujahideen, populace and refugee." That document also indicated that the BIF Baku representative is also the senior representative in Azerbaijan of Hezb-e-Islami of Afghanistan, Hekmatyar's group with which CW2 and CS indicated ARNAOUT had been associated (see paragraph 13 above). The document further indicated that in order to get the x-ray machine to the Chechen Representative, the BIF representative had to lie to Azeri authorities by stating that it was destined for refugee camps in Azerbaijan. The documents further indicated that a nominal amount of money was also provided

22

to the Chechen Representative (approximately $3,225) and that the Chechen Representative asked for anti-mine, steel sole boots for the Chechen *mujahideen*.

36. The documents then indicate that the BIF representative met with *mujahideen* from Hezb-e-Islami as well as several Afghan *mujahideen* who had participated in the Nagorno-Karabakh conflict against the Armenians. In addition, the Chechen Representative told the BIF representative to give any cash for the Chechen *mujahideen* directly to him "or any other tried and/or trusted Chechen who is deeply committed to the cause and has active field participation in the on-going jehad." Other documents indicate that the BIF representative met in Pakistan with ENAAM ARNAOUT upon his return there in June 1995 and briefed him on the foregoing developments and they "discussed latest situation regarding donations of the import of the anti-mine boots for the Chechen *mujahideen*," including the fact that one donor had already committed $30,000.

37. Other documents reflect efforts by BIF personnel in the months after June 1995 to obtain anti-mine boots, particularly those successfully field tested in combat by the Pakistani army, including a report addressed to ARNAOUT of difficulty in obtaining the army boots from the Pakistani Army because the Pakistani Army would not sell the boots to the BIF representative. Still other documents indicate that ARNAOUT was informed that Hekmatyar was in

Peshawar, Pakistan (which is quite close to the border with Afghanistan) for three days in September 1995 and available to meet with ARNAOUT.

BIF Efforts to Purchase Handwarmers for Chechnya in 2000-2001

38. In the fall of 2000, BIF representatives undertook efforts to purchase large quantities of handwarmers and toewarmers for shipment to Turkey for transshipment to Azerbaijan, which borders Chechnya. The manufacturers/wholesalers were told that the handwarmers/toewarmers were to protect refugees from the cold and frostbite. The FBI has checked with a manager of the International Disaster Response Unit of the American Red Cross who, in his ten years of service, could not recall his organization ever providing handwarmers or toewarmers to any overseas locales, including wartorn areas.

39. The FBI has also interviewed an American supplier of handwarmers/toewarmers who stated that the significant purchasers of these items are sporting goods stores who, in turn, retail them to skiers, hunters and fishermen as well as persons who live in cold cities and the military. Humanitarian organization customers are very rare.

40. Documents obtained from the suppliers indicate that the warmers were to be shipped to the Chechen Representative in Istanbul, Turkey – the same person who received material from BIF in the past for delivery to the Chechen *mujahideen*.

24

The "Jihad in Chechnya" Website

41. In or about early 2000, a website (www.qoqaz.net) dedicated to the cause of Chechen *mujahideen* identified the leaders of the military fight in Chechnya as including Ibn al Khattab and included pictures of *mujahideen* training as well as killed *mujahideen*. CW-1 has identified Ibn al Khattab as a well-known *mujahideen* leader with links to Usama Bin Laden. Similarly, CS has described Ibn al Khattab as another leader of the mujahideen who joined the jihad in Chechnya in 1994, after participating in the Afghani jihad. According to CS, once in Chechnya, Ibn al Khattab sent word that he did not need any more fighters but instead needed financial support.

42. The website sought doctors to travel to Chechnya to link up with Ibn al Khattab and provide medical services at the front. The website indicated that those wishing to donate money for the Chechnyan *mujahideen* should save their money and not donate it until a trustworthy aid organization was identified in the website which was to take place on or before February 2000:

> We are not looking for aid organizations. We had already made contact with one such trustworthy charity with experience of work in the Caucasus ... The reason there has been a delay until now of providing the details of this charity is that they are currently organizing themselves in order to be able to receive donations and to ensure that those donations reach those in need, quickly. They have specifically asked us not to disclose their details yet because they consider the money of the people as a trust from Allah, and they wish to forward the money to those in need as soon as possible after receiving it.

25

(Emphasis added)

The website urged persons to withhold donations until the charity was designated and noted that "this War is not going to finish tomorrow ...". The same website urged those wishing to go Chechnya to fight to get training in Afghanistan and noted:

> Anyone interested in going to fight (if they are trained) or in going to train should <u>contact members of their own communities and countries who are known to have been for jihad. You will know these people and they will know you. In these cases, you should only speak in confidence to those whom you trust</u>, rather than speaking to everyone.

. . .

> To see what the Mujahideen in Chechnya need at present, read the answers below.

The next entry urged again that donors withhold money for the time being:

> There is one trusted agency that has set up operations in the region and we will be posting their contact and bank details, etc. on the Internet very soon insha-Allah [God willing]. This is the only aid agency that the Qoqaz web-sites trust and recommend the people to give their donations to.

43. The website urged doctors and medical supplies to "make their way to Chechnya through the aid organizations and join the fighting units of Ibn al Khattab." The website condemned America for its alleged secret financial support for the Russians fighting in Chechnya and elsewhere on the site indicated that "on the other hand, as for those fighting the Muslims and those who support this fight with money, words or actions, the Muslims consider them all

26

as enemies and in the same group." The website also indicated that the news reports on its site were received from correspondents traveling with the fighting units of Ibn al Khattab and that the reports were checked by "Field Commander Khattab" before being posted on the site. The website also indicated that large news organizations desiring to interview Khattab (or a Chechen military leader with whom he worked) could e-mail questions to the site "and we can try without promising to have those questions answered by them."

44. Sometime during or after February 2000, the website posted donations links on the website for two charities, one of which was BIF.

BIF Transfers $685,000 to Chechnya in Four Months in 2000

45. Financial records obtained from Citibank indicate that in the four month period from January 4, 2000, to April 11, 2000, BIF sent nineteen (19) wire transfers from its checking account, number 980110435, in the amount of $685,560. These wires were sent to the bank accounts of the Georgian Relief Association, also known as MADLEE, in Tbilisi, Georgia and BIF's accounts in Baku, Azerbaijan; Moscow, Russia; and Riga, Latvia.

46. On March 13, 2002, the FBI met with a senior law enforcement official in Georgia responsible for counterterrorism. The official confirmed that BIF has an office in Tblisi, Georgia which also identified itself as the Georgian Relief Association,

27

"MADLEE," and that the director is Marat Avlarigov. He verified that BIF in Georgia has received funds from BIF in Illinois in the form of wire transfers, as shown in bank records obtained by the FBI. He also confirmed that Marat's brother is Chamsoudin Avlarigov, who is affiliated with the Chechnyan rebels in Georgia.

47. The Georgian counterterrorism official stated that their investigation has revealed an al Qaeda training camp located in the Pankisi Gorge which is northwest of Tblisi, Georgia. Their investigation has further revealed that the al Qaeda training facility in the Pankisi Gorge is a location where Chechnyan rebel fighters and others are trained.

The Trash Recovered From BIF Concerning Chechnya

48. In November 2000, trash recovered from BIF included a document indicating that BIF spent 42% of its budget on Chechnya. On April 4, 2001, trash recovered at BIF included a magazine with a set of photographs of injured and dead *mujahideen*.

49. A folder recovered in another BIF trash search in December 2001 indicated handwritten notations in Arabic which included the statements:

> Donate generously to Benevolence International Foundation because it is:
> . . .
> It has field offices in the following:
> Europe – Zagreb (Croatia): for relief operations and support of jihad in Bosnia-Herzegovina
> Asia – Peshawar (Pakistan) – to support Afghan jihad, participate in huge effort of rebuilding, and helping war casualties
> . . .

28

America - Chicago - to raise donations and benevolence endowment and deepen volunteer sense among the Muslims and their brothers in disaster areas

. . .

<u>Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands</u>

. . .

<u>Steeds of war projects</u>
Hospitals, <u>saving the mujahideen wounded</u> (health care programs), eight

. . .

(emphasis added)

Training heralds and repelling Christianization activity.

I note that the references to "steeds of war projects" is an apparent reference to a verse in the Koran which reads: "Against them [the enemies] make ready your strength to the utmost of your power, including steeds of war, to strike terror into the hearts of the enemies ...."

<u>The April 1999 BIF Trash Concerning Small Pox</u>

50. On April 21, 1999, trash recovered by the FBI from BIF's office in Palos Hills, Illinois, included, among other things, a copy of a February 1999 article in the *Seattle Times* concerning small pox as a biological terrorism weapon. (The article had been removed from the rest of the paper.) The sections of the text indicating that federal, state and local authorities are poorly prepared for a biological attack involving smallpox were highlighted. In none of BIF's advertisements of its humanitarian causes has it ever indicated that it was dealing with the issue of small pox in any country.

<u>Background Concerning BIF's Civil Suit Against Various Government Officials</u>

51. On December 14, 2001, a search was conducted of the offices of BIF in Palos Hills, Illinois, along with the home of its chief executive officer, ENAAM M. ARNAOUT, removing materials from each place. These searches were conducted pursuant to the emergency search provisions of the Foreign Intelligence Surveillance Act ("FISA") and subsequently approved by the Foreign Intelligence Surveillance Court through the issuance of a search warrant.[15]

52. Also on December 14, acting pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, and an Executive Order implementing these powers, the Treasury Department's Office of Foreign Asset Control ("OFAC") issued an order blocking BIF's assets and records, pending further investigation into BIF's ties to terrorists. BIF filed suit on January 30, 2002, in the matter styled *Benevolence International Foundation, Inc. v. John Ashcroft, Attorney General, et. al,* No. 02 C 763 (N.D. Ill.). As part of that proceeding, BIF submitted a motion for preliminary injunction on March 26, 2002, with a supporting memorandum and attachments (including a "Declaration of

---

[15] Under the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801 *et. seq.,* the Federal Bureau of Investigation has the power to conduct surveillance and searches of foreign powers, including international terrorist groups and their agents within the United States.

ENAAM ARNAOUT" dated March 22, 2002). The complaint (and the preliminary injunction motion) sought, among other things, the return of BIF's seized or blocked property and to void the OFAC blocking order. Alternatively, BIF sought to "unblock BIF's funds on a monthly basis to allow BIF to pay its operating and charitable expenses, with or without monitoring by the government." On April 5, 2002, BIF filed a "corrected" memorandum in support of its motion that includes a "Corrected Declaration of ENAAM ARNAOUT" dated April 1, 2002.[16]

## BIF Efforts in 2002 to Frustrate International Investigative Efforts

53. On March 21, 2002, ARNAOUT called Munib Zaharigac in Bosnia who is a former intelligence officer in Bosnia now serving as director of BIF in Sarajevo. As set forth above, numerous classified intelligence documents had been seized in the March 19 searches of BIF's office in Bosnia. Zaharigac told ARNAOUT that he was ready for jail in Bosnia because he had been searched. ARNAOUT first asked if the searches had recovered any papers from BIF. After he learned that they had not, he urged Zaharigac to maintain that he had done nothing wrong and to hire an attorney to maintain the same. When ARNAOUT learned that Zaharigac was speaking to him from jail, ARNAOUT told Zaharigac not to talk over the telephone.

---

[16] The principal difference in the two declarations is in paragraph 10. The original begins "My attorneys have informed me . . . ." while the corrected version says "BIF's attorneys have informed me . . . ."

Then ARNAOUT indicated that he had sent a message to someone else that when questioned they each should provide information only about themselves but not anyone else. ARNAOUT indicated that when asked about others, they should only indicate that the person is a good person and not provide identifying information about families, wives, children, lives and citizenship, adding: "Me, you don't know anything about me." When Zaharigac indicated that he had already told his questioners about ARNAOUT, ARNAOUT engaged in a leading conversation describing the nature of the relationship advising Zaharigac: "We know each other for the last few years and we've had a business relationship for one and a half years."

54. On March 26, 2002, BIF submitted papers as part of the civil suit it brought against the Treasury and Justice Departments and various of its officials. As part of its submission claiming wrongful conduct by the United Sates Government, ARNAOUT submitted a declaration under oath stating that:

> BIF has never provided aid or support to people or organizations known to be engaged in violence, terrorist activities, or military operations of any nature. BIF abhors terrorism and all forms of violence against human beings.

The declaration was filed in the United States District Court for the Northern District of Illinois.

ARNAOUT Makes Plans to Flee

55. A reliable cooperative witness ("CW4") met with ENAAM M. ARNAOUT and another individual in March 2002. ARNAOUT told the other individual, in CW4's presence, that ARNAOUT planned to leave

32

for Jeddah, Saudi Arabia. ARNAOUT asked CW4 for advice on whether he should: 1) send his wife and children to Saudi Arabia and stay in the United States; 2) whether he should travel to Saudi Arabia and return to the United States; 3) whether he should leave for Saudi Arabia without his family and not return to the United States; or 4) whether he should leave with his family for Saudi Arabia and not return to the United States. Thereafter, on April 2, 2002, ARNAOUT was subpoenaed to appear before the grand jury and the FBI placed ARNAOUT under continuous surveillance, which ARNAOUT has detected.

56. Meanwhile, on April 1, 2002, ARNAOUT submitted a corrected declaration, stating once again that BIF was not involved in providing support to any entities involved in military activity. That declaration was also filed in the United States District Court for the Northern District of Illinois on or about April 5, 2002.

ARNAOUT Urges BIF Employee in Pakistan to Flee to Afghanistan With Money

57. On April 15, 2002, ARNAOUT was called by telephone and told that Haroun Abed (BIF representative in Islamabad, Pakistan) was worried because the intelligence authorities in Pakistan were looking for him and that Haroun wanted to talk to ARNAOUT. ARNAOUT at first said that he did not wish to take Haroun's call stating that he did not want to be incriminated by the telephone conversation. ARNAOUT then agreed to take the call. ARNAOUT then told Haroun to relocate to Kabul, Afghanistan, without his family

33

and with all the money. He warned Haroun that he could be traced by his use of e-mail, telephones and banks and told him to have his brothers bring him one box at a time and that ARNAOUT would stay in contact with him through intermediaries. ARNAOUT also stated that he was like Haroun (i.e., in trouble with the authorities) but did not wish to explain more over the telephone and that ARNAOUT would remain in touch with Haroun if ARNAOUT remained "alive," but ARNAOUT said that he feared that he may not be "alive" much longer.

FURTHER AFFIANT SAYETH NOT.

Thomas J. Simon, Jr., Special Agent
Federal Bureau of Investigation
U.S. Department of Justice

Sworn to and subscribed to before me
on September 13, 2002.

IAN H. LEVIN
United States Magistrate Judge
United States District Court
Northern District of Illinois

34